<div style="text-align:right">BEARD'S EX'R.<br>*vs*<br>BASYE.</div>

---

## Beard's Executor *vs* Basye.

<div style="text-align:right">CHANCERY.</div>

### ERROR TO THE SPENCER CIRCUIT.

*Husband and wife.    Laws of comity.    Bonds of indemnity.*

<div style="text-align:right">Case 41.</div>

JUDGE MARSHALL delivered the opinion of the Court.

<div style="text-align:right">October 14.</div>

In January, 1833, Stephen Beard executed to E. Basye, a writing whereby he did "agree, bind and oblige himself to E. Basye for all loss, damages, trouble and expense that he may sustain or be at, provided there ever should suit be brought against him by Mary B. McDonald, or J. L. McGee, or their heirs, for any negroes that he may hereafter purchase from Joshua McDonald ; and also bound himself to attend to and settle the present compromise, and to attend all other suits that may be brought (against) him for any negroes so purchased." It may be assumed, that shortly after the date of this writing, and upon the faith of it, Basye purchased from Joshua McDonald, six negroes, at the aggregate price of about $1,900 ; that Beard and McDonald having removed soon after to the State of Indiana, McDonald died there in the year 1833 or early in 1834. After which his widow, Mary B. McDonald, brought an action of detinue against Basye, for five of the six slaves which he had thus purchased, and also an action against Bryant Sloan for the sixth one, which had been sold to him by Basye. In 1833, while these suits were pending, Basye filed this bill against the representatives of Beard and others, to secure the indemnity promised in the writing above set forth, by attaching certain debts due to Beard's estate by persons residing in Kentucky. He alledges that he had paid $300 to Beard, and $400 to McDonald's legatee, and that his notes for $1,224, the residue of the price of the negroes, were still outstanding. He also alledges, that he is apprehensive

<div style="text-align:right">The statements and object of Basye's bill and amended bill.</div>

<div style="text-align:right">7 m 133<br>89    57</div>

of losing the suit, and that he has been put to great expense, &c. in defending it, amounting to $300. In an amended bill, he alledges that the five negroes have been recovered from him in the action of detinue, of the aggregate value of $1,900, and that he has satisfied the judgment. And making the executor of Beard, who was also administrator of McDonald's legatee, a defendant in both characters, calls upon him to produce the outstanding notes for the price of the negroes, and prays a decree for the seven hundred dollars which he had paid, with interest, and for a cancelment of the notes, &c. &c.

Answer Beard's ex'r. and M'Donald's legatee made a cross bill.

Beard's executor, in answer, produced the three notes referred to, set out the claims of Joshua and Mary B. McDonald to the negroes, alledged the invalidity of Mrs. McDonald's claim, and charged that the judgment in detinue was obtained fraudulently by a collusive compromise between Basye and the attorney for the plaintiff, and that the verdict was rendered solely on the ground of this compromise, and not as the result of any investigation or decision by the jury. The answer as to these matters, is made a cross bill, to which Basye responds, denying the alledged fraud, and maintaining the validity of Mrs. McDonald's tilte, but admitting that there was a compromise, embracing the value of the slaves to be assessed by the verdict, and also providing that the plaintiff should recover neither hire nor costs. But he denies that any fact was admitted essential to the establishment of the plaintiff's title. And he alledges that the compromise was advantageous to Beard's estate, by placing a less value on the slaves than could have been proved, and by excluding from the recovery the plaintiff's costs. He also relies upon the fact, that Beard was notified of the suit, and bound to defend it, and that he did in his lifetime employ an attorney to aid in the defence, and says that the executor of Beard, though having full knowledge of the suit, not coming forward to his assistance, he did agree as to the value, hire and costs, and to make no further defence than was requisite to put the plaintiff on the proof of her right, and to secure him in his recourse, and he avers that the plaintiff's title was good.

Decree of the Circuit Court.

Upon final hearing, the Court decreed the re-payment by Beard's executor, of the $700 which had been paid, with interest from the date of the recovery in detinue, also the cancelment of the three notes remaining unpaid, and the payment of $200, the fee paid to the attorney in the action of detinue, in addition to his legal costs in that suit, and appropriated to the satisfaction of the decree so much of the attached funds as remained in the hands of the receiver, reciting that two sums specified as part thereof, had been paid over by him to the executor of Beard.

Errors assigned to this decree.

The errors assigned by Beard's executor, question the correctness of every part of this decree. But the principal questions in the case, relate to the title of Mrs. McDonald, and the effect of the judgment in the action of detinue.

The substance of the record of Mrs. McDonald as her husband, cited.

It appears, that before her marriage with Joshua McDonald, Mrs. McDonald was a widow, residing in the State of Louisiana, where her first husband had died, leaving her the owner of a considerable estate, in slaves and personalty; that in the year 1825, she married McDonald, who had no estate, and who, when he had become fully possessed of hers, persuaded her to come with him to Kentucky, under the promise that if she should be dissatisfied, he would take her and her property back to Louisiana; and also, as she says, that there should be no change in the ownership of the property. This removal to Kentucky took place about the year 1826, and in May, 1829, Mrs. McDonald filed her bill in the Circuit Court of Spencer county, alledging ill treatment in various ways by her husband, and a waste of her property, and praying for a divorce, and for a restoration of all her property, to which, as she alledged, she remained entitled by the laws of Louisiana, notwithstanding her marriage. At an early stage of this suit, an interlocutory order was made, directing one third of the slaves and land in the bill mentioned, (the land having been purchased with the funds derived from the wife's estate,) to be assigned to Mrs. McDonald. Under this order seven slaves were alotted to Mrs. McDonald, on giving bond to have them forthcoming to answer the decree of the Court, and

BEARD'S EX'R. *vs* BASYE.

fourteen were left with her husband, who had already given similar bonds under the restraining order granted on filing the bill. The twenty one slaves were all either of the original stock which had belonged to Mrs. McDonald in Louisiana, or their children.

Compromise of the last cited case.

In December, 1832, a writing was executed by persons professing to be the authorized agents of McDonald and wife respectively, which purported to compromise this suit by a relinquishment on the part of the husband, of all claim to the seven slaves which had been allotted to the wife, and which are stated in the instrument to have been owned by her prior to her last marriage, and to have belonged to her in her own right, under the laws of Louisiana, and by the will of her husband; and McDonald was also to pay to her the sum of $250, which when paid, was to be in full of all claim to dower, alimony or in her own right, which she had or might ever have in the estate of McDonald, who on his part, relinquished all claim, present or future, to the above mentioned property, and to all which his wife might thereafter acquire; and by the instrument Mrs. McDonald receives this provision in full of all claim, &c., and relinquishes all claim of dower; and in fee to the tract of land above mentioned, and also to fifteen slaves by name, all of whom were in fact, just as much her property as the seven that she retained. And it was further stipulated that the agreement should be entered as the decree of the Court whenever the $250 should be paid, &c.

On the 8th of January, 1833, an additional agreement was executed by the same parties, by which the $250 were released, and in lieu thereof McDonald relinquished to his wife 45 acres of land, being the one third which had been allotted to her under the interlocutory order, and she was to pay him $63 79, and this alteration was to be incorporated and made a part of the first agreement.

This is the compromise which Beard undertook to attend to and settle in the indemnifying bond, dated a few days after this last agreement, and on which the present suit was founded. But although placed among the papers of the suit to which it relates, it never was made the decree of the Court, and has received no judicial sanction.

In May, 1834, the death of McDonald was suggested, and at the succeeding term the record states that the suit was dismissed on motion of the complainant's agent.

The controversy in regard to the slaves stated.

The six slaves sold by McDonald to Basye, and to which Beard's promise of indemnity or guaranty is understood to relate, are a part of the fifteen named in this compromise, and relinquished to McDonald; and except Jacob, who was sold by Basye to B. Sloan, are a part of of the fourteen which had been allotted to McDonald, or left with him under the interlocutory order. Beard's executor denying that Mrs. McDonald ever had title to the slaves in Kentucky, except under the compromise, relies upon that instrument as having transferred to her husband and extinguished in her, whatever right she may have had in any except those relinquished to her. It is contended on the other hand, that she did not lose her property in the slaves by her removal with her husband to Kentucky, and that the alledged compromise was imposed upon her by fraud, and was otherwise ineffectual to divest her of her right.

The civil code of Louisiana in regard to the property of *femes covert,* which renders voluntary separation of property between husband and wife void.

It is manifest from the articles of the civil code of Louisiana, 2,314 and 2,315, which are incorporated into this record, that the slaves in question having been the property of Mrs. McDonald before and at the time of her marriage, did not, by the marriage, vest in her husband, but remained her separate property of the class denominated dotal. Article 2,399, authorizes the wife to "petition against the husband for a separation of property whenever her dowry is in danger from his mismanagement or otherwise, or when the disorder of his affairs induces the belief that his estate will not be sufficient to meet her claims." By article 2,401, "separation of property must be petitioned for and ordered by a Court of Justice, after hearing all parties. It can, in no case, be referred to arbitration. Every voluntary separation of property is null and void, as it respects third persons, and the husband and wife between themselves." And by article 2,410, "the wife separated in person andproperty or in property only, has again the free administration of her estate. She may dispose of her movables," &c.

Assuming for the present, that the mere fact of removal to the State of Kentucky, did not transfer to McDonald the slaves of his wife, but that the property still remained in her, the question to be considered is, whether she was divested of her right by any subsequent act of her husband, or herself, or of both. If this question were to be decided by the laws of Louisiana, we should have to regret that so small a portion of those laws has been proved in this case. It is, however, clearly inferrable from the articles above cited, that until there has been a legal separation of person or property, or both, the husband has the right to administer or manage the dotal property of the wife as well as his own. Hence it is argued that his alienation of the slaves to Basye, was sufficient to invest him with an indefeasible title. But without conjecturing what may be the extent or the limitations of the husband's right before separation, or what title his *bona fide* alienee may acquire as against the wife, we think it may be inferred with sufficient certainty, that where the husband has no estate but his wife's dotal property and its proceeds, when he is evidently endeavoring to convert her property and divert it from the legal course of succession, and especially when upon these and other grounds the wife is before a competent tribunal, claiming a separation, and asserting her right to all the property in the husband's possession, one who, with a knowledge of these facts, purchases from him a portion of the very property brought by her upon marriage, and claimed in the proceeding for a separation, will find no protection in any article of the code of Louisiana. Even the principles of the common law, which pays so much regard to possession and ostensible ownership, would not allow a purchase under such circumstances, to impair the pre-existing rights of the wife. It would be strange indeed, if the laws of Louisiana would permit the rights which they specifically reserve to the wife, to be thus defeated. At any rate, we should not, upon conjecture, assume that this is so. We conclude, therefore, that upon the assumption that Mrs. McDonald's title remained, notwithstanding the removal to Kentucky, it was not, under the principles either of the Louisiana or the Kentucky law, and by the mere act

of her husband, transferred to Basye, to whose purchase all the impairing circumstances just referred to were certainly applicable. Was her title then, divested by the compromise of her suit for a separation?

A woman, the owner of slaves, married in Louisiana, and was removed by her husband to Kentucky, where she sued for alimony, and the suit was compromised by the professed agents of the parties, and part of the slaves of the wife surrendered to the husband. Held that the wife's right to the slaves surrendered to the husband was not impaired by the compr'se. which was not made the decree of the Court.

Whatever might have been the effect of a decree embodying this compromise, (and even such a decree might have been set aside in equity, if fraudulently procured,) the agreement referred to derives no force or sanctity from having been made in relation to a judicial proceeding, or from having been filed among the papers of a pending suit. There never was any judicial action upon it. Nor does it appear to have produced any effect upon the conduct of the suit, at least none prejudicial to the rights of McDonald. It stands as a mere private agreement between husband and wife by their professed agents, relating to their mutual claims upon the property. As such it was liable to be impeached in the action of detinue as it is also in this suit, on the ground of the incompetency of Mrs. McDonald, or want of authority in her agent, or want of mutuality of obligation, or on the ground of fraud against her. Testing its efficacy by the facts and with a view to these objections we are of opinion that it must be regarded as wholly ineffectual both at law and in equity, to divest Mrs. McDonald of her title.

Mrs. McDonald's agent, though authorized to conduct the suit, had no authority to alienate her title to the property, nor did she ratify it.

1. There is no evidence of authority in the person professing to act as the agent of McDonald, except in the acquiescence of the principal in an arrangement by which two thirds of his wife's property was vested absolutely in him. 2. The agent of Mrs. McDonald, though authorized to conduct the suit, had at the time of the compromise, no color of authority to alienate her title; and although she afterwards made her mark to an instrument importing a ratification of what he had done in compromising the suit, there is, in the instrument executed by her, no specification of the terms of the compromise, and nothing to indicate that she was thereby deprived of all claim, future as well as present, upon the slaves which had been left in her husband's possession. Her inability to read writing, the tenacity with which, in her amended bills and affidavits, up to a period but little anterior to the execution of the first agreement of compromise, she main-

tained her right to all the slaves; the fact that her husband and others, among whom was Beard, were not only resisting this claim, but attempting to defeat it by alienations of the property, immediately after the compromise and before the ratification, the obvious inequality and injustice of the arrangement, if the slaves all belonged to Mrs. McDonald, and the circumstance that while the agreement seems to make the compromise of the suit and the release of the seven slaves to Mrs. McDonald and a relinquishment by her of all claim upon the estate of McDonald prominent objects, stated in so many words; there are but few words not readily distinguished from the context, which import an absolute relinquishment of the slaves by her to McDonald; all these circumstances tend to raise at least a suspicion that the ratification executed by her after she had returned to Louisiana, may have been obtained without a proper representation of the real terms and intended effect of the agreement to which it relates. It does not appear by whom it was procured. Its execution may have been obtained by Beard or his agent in pursuance of his undertaking made only *two or three weeks before*, to attend to and settle the present compromise. It is not shown that the agent, whose acts it professes to ratify, ever received it, or acted under it. At any rate, he did not carry out the agreement which, but for this ratification, was wholly unauthorized, but without having it entered as the decree of the Court, caused the suit to be dismissed on his own motion. We should hesitate to pronounce this agreement and ratification effectual, even if Mrs. McDonald had been competent to make them so.

**The interest of the wife in her dotal or separate property, cannot by the laws of Louisiana, be passed to the husband by a contract betw'n husband and wife without the sanction of the judge.**

But supposing the agreement to have been executed by the husband and wife in person, then as a private agreement for the separation of the wife's property from that of the husband, before a final hearing of the suit, and without the sanction of the Judge, it was null and void, both as to themselves and as to strangers, by the denunciation of article 2,401 of the Louisiana code, if it is to be tested by that code. As an agreement between them for a division of the wife's property alone, before a legal separation of person or property, it comes within the spirit if not within the letter of the same denunciation. And in either of these aspects, it is denounced as void by the

common law and by our law under which the husband and wife can make no valid contract directly between themselves, and no valid transfer of property directly from one to the other. There may indeed, be an exception in our law in the case of personal property held in trust for the sole and separate use of the wife, to which the phrase, separate property of the wife, is here applied. According to many, and perhaps the current of authorities, the wife, with respect to such property, is regarded in equity at least, as a *feme sole.* But the dotal property of the wife, under the laws of Louisiana, though called her separate property, stands on a different ground. It is not so denominated, because she retains the right of separate control and disposition notwithstanding the marriage. For until a legal separation of person or property, she has no such right under any article of the code which has been exhibited in the case. But on the contrary, the right of administering or managing the property of each, belongs, until separation, to the husband; and the wife's dotal property is called her separate property, to distinguish it from the common property, consisting of the gains or *acquets* made during the marriage, by the property and exertions of both; and because it was in fact her separate property, before and at the marriage, and by the law of Louisiana, continues to be her property, notwithstanding the marriage, subject, upon her petition, and for just cause, to be again restored to her separate control and disposition, by the decree of a Court, and subject, also, to be resumed by her, (perhaps under certain formalities,) upon the dissolution of the marriage, either by divorce or by the death of the husband.

A marriage in Louisiana where the right of the wife to her property is protected to her, *is not lost* by her removal by her husband with her property to Kentucky. After his death her right is clear to her dotal property as it existed at the marriage.

We are of opinion, therefore, that Mrs. McDonald was not divested of her title or interest in these slaves, either by the sale made of them by her husband, or by her own act in making or ratifying the compromise under which his sale is attempted to be sustained. And we are thus brought to the very important question, whether by the removal of McDonald and wife to Kentucky, the right of the latter to the slaves, which notwithstanding her marriage, continued, by the laws of Louisiana, to be her property, became under the operation of our laws,

absolutely lost to her and absolutely invested in her husband. It does not appear, and cannot be inferred, that at the time of the marriage Mrs. McDonald contemplated a removal to Kentucky, or consented to any modification of the marital rights, as regulated by the laws of Louisiana applicable to the case. If McDonald then intended a removal, with the purpose of thereby acquiring absolute dominion over the property of his wife, he intended and attempted to practice a fraud upon her, which ought not to be sanctioned, unless the law imperiously confirms the intended effect. It might not, perhaps, be difficult to draw this inference of original bad faith, from his subsequent conduct. But supposing the idea of removal and of asserting absolute dominion over the property, to have been afterwards conçeived and matured, it was still a fraud of the most flagrant character, to use for such a purpose the power and influence and deceptious promises of a husband to induce the wife, in ignorance of the consequences, to consent to an act which might be, and was intended to be so fatal to her interests. If McDonald, when his wife after their removal, became dissatisfied and wished to return, had taken her and her property back to Louisiana, as he had promised to do, we suppose there can be little doubt that her condition and rights with respect to the property, would have been there considered as unaffected by the removal. If she had absolutely refused to accompany her husband, and he had brought the slaves to Kentucky without her consent, leaving her in Louisiana, would she not have retained her rights under the laws of the latter State, and might she not have asserted them in a tribunal of Kentucky, and with effect, unless against innocent purchasers even before, and most certainly after her husband's death? And has she lost her right, a vested right in existing property, by consenting to the removal of herself and property, under delusive promises, the fulfilment of which would have secured her right? She did in fact become dissatisfied soon after the removal to Kentucky. She manifested her desire to return, at least as early, and as she says, before the commencement of her suit for a divorce. Before its termination, she did in fact return to Louisiana, where she still remains, claim-

ing a citizenship there. And upon the death of her husband, she instituted her remedies for the recovery of the slaves which he had sold. Did her consent to the removal, even if it proceeded merely from a sense of duty and conjugal affection, deprive her absolutely of her citizenship in Louisiana, and of all the rights secured to her by the laws of that State? Did the determination of her husband to remove, place her under the necessity of either surrendering her property by accompanying him, or of renouncing his authority and society, and appealing to the laws to prevent a removal of the property?

Most assuredly we should be quite certain that there is something in the laws or policy of Kentucky, deciding this question peremptorily and unequivocally in the affirmative, before we would be authorized to determine, that by the removal to Kentucky of a husband and wife with property which belonged to the wife at the place of their marriage and former residence, and until they entered Kentucky, the property became at once, either in virtue of her consent to the change of domicil, however obtained, or in virtue of the actual change, whether with or without her consent, absolutely lost to her, and absolutely transferred to her husband. For the principle which would place so unjust a power in the hands of the husband, and present to the wife so cruel an alternative, we are referred, not to any specific law or policy prohibiting the wife from having a separate interest or property in personalty or slaves, but to the general laws regulating the marital relation and rights, and to the general fact or principle, consequent upon those laws, that the wife does not and cannot hold in her own right, the absolute property in personal effects. Our law is, that the marriage is an absolute gift or transfer of all the personalty then belonging to the wife, and of all that is afterwards during the coverture transferred to her. What she has at the marriage, becomes by the marriage, the property of the husband, and what she acquires afterwards is also his by virtue of the marriage and the law. Our statute makes substantially the same regulation with regard to slaves, vesting such as belonged to the wife, at the marriage, in the husband, and also such as come to her dur-

ing the coverture, by descent, devise or otherwise. She cannot hold previous acquisitions, because by the marriage she or the law gives them to the husband, and for the same reason she cannot hold future acquisitions. And thus all personal property, whenever and however acquired by her at or during the marriage, is ordinarily embraced in the disability or prohibition, because ordinarily there can be no personal porperty owned or acquired by the wife to which this rule in one or the other of its branches will not apply.

But here is a case in which the question is not as to property acquired after the marriage and within this State, but as to property owned by the wife before the marriage, and which, notwithstanding the marriage, remained hers by the laws of the State in which she and her husband were married, and continued for some time to reside. Most certainly that part of the law of this State, which transfers the wife's property at the time of the marriage, to the husband, did not operate in this case, because neither the marriage, nor the parties, nor the property, were under the jurisdiction of this State, but were all within a State whose laws did not transfer the property to the husband, but preserved the right in the wife, notwithstanding the marriage. It is equally certain, that that principle of the law which vests in the husband the acquisitions of the wife, does not apply to these slaves, because they were neither acquired after the marriage, nor after the removal to this State, but belonged to her before marriage, and continued hers afterwards, until she and they came with her husband to this State. By what law then, is she to be divested of this vested right and ownership, and the slaves which were hers vested absolutely in her husband? Surely it will not do to say that, because women married and residing here, do not and cannot hold personal property, therefore a woman married elsewhere and allowed by the laws there to hold her property, shall, upon coming here with her husband, be deprived of all interest to it.

The laws of Louisiana may be consulted to ascertain and determine a right

The laws of Louisiana cannot, it is true, be brought here to create a right, nor to regulate the mode of its exercise or assertion, and certainly not to establish a right in contravention of our laws or policy, and to the injury

of our citizens. But they may be brought here to establish or prove a right existing there while the parties and the subject were wholly within the jurisdiction of that State, and it is for the laws here to determine what modifications of right have been caused by the introduction of the parties and the subject within their jurisdiction. It is to be observed then, that the principle of our law which establishes the title of personal property in the husband in exclusion of the wife, and which prohibits or disables her from holding the title, relates to the title only, that is, the legal title or absolute ownership, and not to the beneficial interest in the use. The wife's legal title in personalty in possession, is *eo*-instanter, vested in the husband, and carries with it the beneficial interest and the right of absolute disposition, unless the beneficial interest has been distinctly separated or reserved, and the uses declared as a trust upon the title.

acquired under them, and will be applied in Ky. in determining those rights between husband and wife.

But such a separation of the beneficial use from the title, though in favor of the wife, and even to the exclusion of the husband, is not prohibited either by the letter or the policy of our laws. On the contrary, such provisions for the separate use of the wife, are frequent, and whether made at home or abroad, are uniformly sustained by our Courts, if made in good faith, and so manifested to the world by registration, as not to become the instrument of injury to others.

A separation of the legal title of slaves from the beneficial use even in favor of the wife, which exists in respect of property owned by the wife at the marriage, is not so far repugnant to the policy of Kentucky that the right of the wife cannot be protected here.

Under the operation of the principle that the legal title of the wife vests in the husband, but that a separate use or interest declared in her favor, may be valid and will be sustained, it has been decided that if a chattel be bequeathed to the wife in terms clearly indicating that she is to have a separate property or interest in it, the husband will take the legal title as trustee of the wife, and that the Court will, if necessary, appoint a trustee to secure her interest. It has also been decided that if a *feme* conveys her property before marriage, to a trustee for her own separate use, &c., free from her intended husband, the title will revert when the purposes of the trust are completely and certainly accomplished and at an end, and that she or her representatives may maintain an action at law upon it; and it is well settled that the purcha-

If chattels be bequeathed to the separate use of the wife, though the legal title vest in the husband, equity will regard him as trustee for the wife.—*Argu.*

ser of trust property, with notice of the trust, acquires no better right than the trustee had.

Why then, and upon what principle of law or policy, we again ask, was Mrs. McDonald divested of all interest in these slaves by her removal with her husband into this State? Was she deprived of a vested right without contract, without fraud, and without crime, merely by subjecting herself and property to our laws? There was no conflict of laws in regard to the reservation to her of an interest in her property at the time of her marriage; and her removal to Kentucky certainly gave no retroactive operation to our laws, by which her interest was unsettled from the beginning. She came here unquestionably with a vested right and interest, and the question is as to the effect of our laws upon that interest. The broadest inhibition of our law declares at most, that she shall not or cannot hold the legal title for her own benefit. But there is no prohibition against the property being held either by her husband or another, in trust for her benefit. If then her pre-existing right was at all affected by her coming here, would it not be more consonant with justice and analogy to say, that it was modified rather than destroyed, and that if her husband became invested with the legal title by virtue of our laws, he took it in trust for the benefit of his wife, or the joint benefit of both? But even the laws of Louisiana, (in which perhaps the distinction between the legal and equitable title may be unknown,) are not necessarily to be understood as reserving to the wife what we would consider the legal title, since the administration and management, and ostensible control and possession would seem to be in the husband, until a separation takes place. If those laws had expressly declared that the husband should hold the dotal property of the wife, as trustee for the joint benefit, until separation of persons or property, on which it should revert absolutely to the wife, there would have been no conflict either between the laws of Louisiana and those of Kentucky, in their operation on the same subject, or between these latter laws and the right of Mrs. McDonald, as existing before she came to this State, and afterwards asserted here. If on the other hand, the laws of Louisi-

ana had expressly declared that the legal title should remain in the wife, vesting the possession and control of the property in the husband for their joint benefit, then there would have been a conflict between her right to hold the legal title as reserved by the foreign law, and our law, which prohibits or prevents a wife from holding the legal title; and so far as the interest of our citizens, who might deal with the husband in the faith of his being the owner, might be injuriously affected by regarding her as the legal owner, it might be proper, to the extent of this conflict, and for the protection of our own citizens, so far to disregard the foreign law, and to consider our law as operating to transfer the legal title to the husband. But even this would not necessarily involve the destruction of the wife's interest, since the right to the beneficial use jointly or separately with her husband, might remain in her without a violation of our laws, and without injury to our citizens, of whom none would be affected by her interest but such as should have notice of it, and a few years might, as in other cases, subject the property absolutely, to the claims of her husband's creditors. The laws of Louisiana, so far as they are placed before us, make, (as has been stated,) no disposition of the legal title by name; neither do they denominate the husband a trustee. But if it were necessary for the preservation of the interest which they undoubtedly reserve to the wife, it might not be doing violence to them to consider them as making the husband, in fact, a trustee. We cannot, however, suppose that the question should or can be made to turn upon the admissibility or inadmissibility of such a construction, or upon the mere formal mode in which the right of the wife is reserved or secured by the law of her original domicil. The important matter is that, notwithstanding her marriage, a right in her property was reserved to her by the law of the matrimonial domicil, to become perfect upon separation, by death or otherwise, and that this right existed in full force up to her removal to Kentucky. Justice and policy, as well as comity, require that this right should be sustained as far as it can be done, without violating the laws or some stringent policy of our own State, or doing injustice to its citizens;

and we think these limitations are observed in saying that at most, our law operated to invest the husband with the legal title and use, until separation, or until the dissolution of the marriage by his death, when it reverted to the wife, except as to such property as he may have sold to a *bona fide* purchaser, not having notice of her title; and that as Basye purchased the slaves with a knowledge of her claim, she had a right to recover them from him in the action of detinue.

In coming to this conclusion, we have not thought it necessary to refer to the various and conflicting opinions which are copiously cited by Judge Story, in the sixth chapter of his work on the conflict of laws. It would be difficult indeed, to deduce, either from the conflicting authorities there referred to, or from the reasoning or any indication of opinion by the author himself, a satisfactory conclusion with regard to the law applicable to the question which we have been discussing. But in an extract from Burge's Commentaries on colonial and foreign laws, &c., contained in note 3 to *section 187, (4) page 161,* 2d edition, we understand the doctrine to be maintained, that independently of the theory of a tacit contract between the parties at the time of their marriage, adopting the law of the matrimonial domicil, (with regard to which there is much diversity of opinion,) that law should, in case of a subsequent change of domicil, regulate the rights of the parties in property held before the change. We confess, however, that after such examination and reflection as we have been able to bestow upon the subject, we find the general question involved in great uncertainty, and so far as opinions are concerned, in no little confusion. We, therefore, restrict the conclusion which has been stated, to the particular circumstances of this case, including not only those under which Mrs. McDonald was induced to come to Kentucky, and the pendency of her suit for a divorce and restoration of her property when Basye made his purchase, but also the fact that her husband removed shortly afterwards, to the State of Indiana, where he died, and that before his death she had returned, permanently, to Louisiana, and thus evin-

ced, as soon as her disability was removed, her election never to have become a citizen ef Kentucky.

Upon looking into the record of the action against Basye, we find the facts on which the plaintiff's right of recovery depended, substantially made out in proof. The defences which as Beard's executor now alledges, might and ought to have been made on the ground of the compromise, and the sale by McDonald, would have been unavailing. And as Beard's executor, though he had notice of the pendency of the action, (as Beard himself probably had in his lifetime,) did not come in aid of the defence, which he was bound to do by the covenant, we are of opinion that Basye was not bound to make an unavailing resistance; and that he has not lost his recourse, by failing to make defence further than to put the plaintiff on the proof of her title, and especially as his title might perhaps have been secured, if Beard had attended to the compromise, and had it made the decree of the Court. If there had been no compromise in the action of detinue, and the jury had found a verdict on their own consideration of the evidence, we should have regarded the judgment as evidence not only of eviction, but also of the paramount title of Mrs. McDonald. But the verdict having in effect been rendered by agreement of the counsel, on their judgment of the evidence, and under a compromise as to the amount of the recovery, we consider the judgment as evidence of eviction only, leaving the question of title to be contested and decided in this suit. Indeed it is not without some hesitation, that we have come to the conclusion that the judgment should even be deemed effective as evidence of actual eviction. It is only upon the ground that Beard's executor had notice of the action, and should have defended it, that the compromise by Basye can be at all justified, or that the judgment founded on it can be regarded as valid for any purpose against the executor.

Basye purchased the slaves with notice of Mrs. McDonald's claim, and he might not perhaps be entitled to recover on Beard's agreement to indemnify him, if there were ground for inferring that he was engaged in a fraudulent scheme for defeating her right. But he alledges that

he purchased in faith of the compromise, which Beard represented to be fair and valid, and which he undertook to attend to and settle, and this may be assumed to have been the case.

Beard covenanted to indemnify Basye against defects in the title to certain slaves which he purchased as the property of M'D. Basye was sued, of which Beard had notice, Basye was only bound to require of M'D. to make out his title, and Beard was bound by the decision.

We have had some difficulty in determining whether the value of the five slaves as assessed in the verdict and judgment against Basye, should form the criterion of his recovery upon the covenant of indemnity. The verdict having been founded on the agreement of the parties, is no evidence as against others, of the actual value of the five slaves at the time of its rendition. And as five only were recovered, the original price of the six in Basye's purchase, does not furnish a proper criterion of indemnity for the five. But he alledges, and there is no evidence to the contrary, that the value assessed was in fact less than the value which might have been proved, and there is enough besides in the case, to authorize the presumption that the five slaves recovered had increased in value after the date of Basye's purchase. If under the broad terms of Beard's covenant of indemnity, he was bound for the value of the slaves at the time of the loss, it should perhaps be assumed, upon the whole case, that the five which were recovered in the action of detinue, were not valued too high in the verdict.

If on the other hand, the price of the slaves in Basye's purchase from McDonald, should form the criterion of indemnity for the loss of any of them, then although it is evident that the price recovered by Mrs. McDonald did not in that purchase cost $1,900, which was the contract price of the six; yet as she had an action pending in the same Court for the sixth, against Basye's vendee, in which she had presumably the same right to recover as in the action against Basye for the five, and as the action for the sixth was in fact dismissed by her at the term succeeding that at which she recovered the five, it may be inferred that the compromise was intended to protect, not only the right of Basye to the five for which he was sued, but also that of his vendee to the sixth, for which an action was pending against him; that Basye, in effect, agreed to pay to Mrs. McDonald for all the slaves, the same price which he had agreed to pay her

husband for them; and that to secure and effectuate this agreement, the contract price of the six was inserted in the verdict and judgment against Basye as the agreed value of the five. Upon this assumption, the only question is, whether upon ascertaining the superiority of Mrs. McDonald's title, which Beard had undertaken not merely to defeat, but by compromise to quiet, and in fact procure, and upon the failure of Beard and his executor, on notice, either to defend the suit or to procure or quiet the title, Basye might not, even without a judgment of eviction, procure her title himself, upon fair terms, and at the expense of Beard's estate, so far as Beard was bound by the covenant of indemnity. We think he had a right, under such circumstances, to bargain with Mrs. McDonald for her title, and to bind Beard's estate under the covenent of indemnity, at least to the extent of the original contract price. If, therefore, Basye had paid the whole price of the purchase from McDonald, it would have been proper to have decreed a restoration of the entire sum agreed to be paid to Mrs. McDonald, and secured by her judgment, of which satisfaction was acknowledged. But as a part of the original purchase money remains unpaid, and the notes for it have never been assigned for value, but are in the hands of the administrator of McDonald's legatee, (who is the same person as the executor of Beard,) the equity of the case is answered by cancelling these notes, or enjoining their collection, and restoring the money paid. The legatee of McDonald, who sold and either expressly or impliedly warranted the title of the slaves, has no equity either against Basye, to enforce these notes, or against Beard to throw the loss on him or his estate. If it be true, as suggested in argument, that it has been discovered since the rendition of the decree, that Basye in fact procured Mrs. McDonald's title for considerably less than $1,900, such a discovery can have no effect upon the question of reversal or affirmance, which must depend upon the record as it stood at the final hearing. How far it might be a ground for questioning or limiting the operation of the decree in some future proceeding, need not be determined.

With regard to the sum of $200, decreed on account of the fee paid by Basye to the attorney who defended the action of detinue, it is immaterial whether Beard was ever bound directly for it or not. There is no dispute that Bayse defended the action for some time, with vigor and at considerable expense and trouble, and that he had an attorney who attended to the defence. It is proved that the fee promised and afterwards paid by Basye, was $200, which is not shown to have been unreasonable. He, therefore, had a right to recover that sum ; and as there is enough in the record to sustain the recital in the decree, that certain specified sums, part of the attached fund, had been paid over to Beard's executor, the decree is not erroneous in this respect, and is, therefore, in all its parts, affirmed.

*Grigsby* for plaintiff; *Hardin, McHenry and Morehead & Reed* for defendant.