Townes vs. Durbin.

CASE 40—PETITION ORDINARY—FEBRUARY 16.

## Townes vs. Durbin.

APPEAL FROM UNION CIRCUIT COURT.

Movable property of a decedent passes and is distributed according to the law of the country in which he was domiciled at the time of his death.

Townes vs. Durbin.

The law of the matrimonial domicil is the rule which determines the rights of both husband and wife in regard to movables, slaves included, owned by either at the time of marriage.

See the opinion for extracts from Story on Conflict of Laws, recognized by the court as general principles touching the rights of husband and wife in relation to the property of the latter at the time of the marriage, as to what exent fixed and determined by the law of the place of marriage.

Under the act of 1846, "further to protect the rights of married women," and the Revised Statutes, the husband, surviving the wife, is only entitled to a life estate in her slaves.

Husband and wife were residents of and married in Kentucky, in 1852, she owning slaves at the time of her marriage. They subsequently went to Missouri, taking the slaves with them; and afterwards took up their residence in Illinois, leaving the slaves in Missouri. In 1853 the wife died in Illinois, leaving no issue alive, and a short time afterwards the husband died in the same State. One of the slaves is in this State, and is sued for by the father of the wife, as her heir at law. *Held*—that he is entitled to recover.

HUGHES, DALLAM & HUGHES, for appellant.

JOHN M. HARLAN, for appellee, cited *Story's Conflict of Laws*, chap. 9, *page* 635; *Ib., sec.,* 46; 3 *Vesey,* 108, 201; *Greenleaf's Ev., sec.,* 108; 3 *Conn. Rep.,* 250; *Paige's R.,* 611; *Story's Conflict of Laws, secs.* 43, 44; 5 *Vesey,* 787; 14 *Howard S. C.,* 422; *Story's Com.,* 44, 6 *rule;* 2 *Bos. & Pul.,* 228, *note* 239; 3 *Vesey,* 198, 291; *Hagg. Consist.,* 374, 437; *Story's Conflict of Laws, sec.* 637; 5 *J. J. Mar.,* 484; 15 *New Hamp. Rep.,* 138.

CHIEF JUSTICE STITES DELIVERED THE OPINION OF THE COURT:

In the spring of 1852 Edmonia Townes intermarried, in this State, with John H. Durbin—both parties then residing in Kentucky. At the time of the marriage the former owned several slaves, including a woman named Harriet, now in dispute, which had been devised to her by her grandfather.

In the winter of the same year the parties went to Missouri, and took with them their slaves and personalty. In the spring of 1853 they left Missouri and took up their residence in Shawneetown, Illinois, just opposite the county of Union in this State—their slaves meanwhile remaining in Missouri.

In September, 1853, the wife died in Illinois, leaving no issue alive; and in a short time thereafter the husband died in the same State, and at the same place.

Townes vs. Durbin.

The appellee, Mary Durbin, a sister of the husband, obtained possession of the slave Harriet, and, after her brother's death, claimed her as her own property.

In October, 1854, the appellant, who was the father of the deceased Mrs. Durbin, brought this suit to recover said slave—claiming her under the laws of descent in this State.

The appellee answered his petition, and denied his right to the slave, saying, in substance, that Mrs. Durbin had by her last will devised the slave to her husband, and that the latter had, in like manner, devised her to appellee. It is also averred in the answer that, by the laws of Illinois, Mrs. Durbin, though a *feme covert*, had the right to dispose of her personal and *separate* estate by last will, and also, that both her will and that of her husband had been duly admitted to probate in the proper county in Illinois, where they were domiciled when they died.

Upon a trial in the circuit court the appellant introduced evidence conducing to show the foregoing facts, and also proved the value of the slave when the suit was brought. The circuit judge, however, thought that he was not entitled to recover, and, on motion of appellee, told the jury to find as in case of a nonsuit. A verdict and judgment having been rendered against Townes, he has appealed, and complains here of the peremptory instruction of the circuit court.

For appellant it is contended, that the question as to the actual domicil of the deceased husband and wife should have been left to the jury; and that the facts which the evidence conduced to establish entitled him to a recovery—there being no opposing evidence in support of the title set up by appellee.

On the other hand it is insisted, that giving full effect to all the evidence of appellant, it clearly appeared that Durbin and wife, when they died, were domiciled in Illinois; and that, before appellant could pretend to claim the slave, he should have introduced some evidence showing what the laws of descent of that State were, and thereby manifested his right; and that, in the absence of any evidence showing his title by descent under the laws of Illinois, the instruction to find for appellee was proper. Or, in other words, that as Durbin and wife were

domiciled in Illinois when they died, and the slave was a movable, or personal estate, the right thereto was controlled by the laws of descent of that State, and appellant could only recover upon showing what those laws were, and that he was, in virture thereof, entitled to the slave.

That Durbin and wife, when they died, were domiciled in Illinois is, we think, very clear from the evidence. And if, as is supposed, the right to the slave depended upon the laws of descent of that State, no doubt could be entertained as to the propriety of the instruction complained of, because such right could only be manifested by evidence showing what the laws of Illinois, controlling the descent of personal property, were at the time of the death of Durbin and wife ; and, also, that under those laws the right to the slave passed to appellant. It devolved upon him, being the plaintiff, to show title, and unless he succeeded in doing this it was, of course, the duty of the court to instruct as in case of a nonsuit.

But we are unwilling to admit that the laws of descent of the State of Illinois control this case, or determine the rights of the parties to the slave.

In denying, however, such effect to the Illinois law of descent, we would by no means be understood as questioning the well established doctrine that now prevails in almost all civilized nations, to-wit, that movable property of a decedent passes and is distributed according to the law of the country in which he was domiciled at the time of his death. *Mobilia personam sequnter, immobilia situm.* This principle has been distinctly and often recognized in Kentucky. (*Sneed vs. Ewing,* 5 *J. J. Mar., and the authorities there cited.*) And, if it were applicable here, would most certainly control the present controversy.

If, however, the deceased husband had but a life estate in the slave in dispute, as we think the facts now disclosed by the record clearly show, it results necessarily that no interest passed by descent at his death, and, moreover, that the Illinois law of descent, whatever it may be, can in no wise affect the rights of either party to this controversy. And in this view of the case the only question to be considered is, wheth-

er appellant was not entitled, by the law of this State, to the slave in dispute, immediately upon the death of the husband of his daughter.

To show that John H. Durbin only owned a life estate in the slave, as the case is now presented, it is only necessary to recur to a few general principles touching the rights of husband and wife in relation to the property of the latter at the time of the marriage, as fixed and determined by the law of the place of marriage—principles which, though not so familiar as that controlling the distribution of the movables of a decedent, already mentioned, are still, in our judgment, sufficiently established upon reason and authority, to warrant us in recognizing them as good law, and applicable to this case.

These rules are thus stated by Judge Story in his work upon the Conflict of Laws, (*page* 291 :)

"1. Where there is a marriage between parties in a foreign country, and an express contract respecting their rights and property, present and future, that, as a matter of contract, will be held equally valid every where, unless, under the circumstances, it stands prohibited by the laws of the country where it is sought to be enforced. It will act directly on movable property every where. But as to immovable property in a foreign territory, it will, at most, confer only a right of action to be enforced according to the jurisdiction *rei sitæ*.

"2. Where such an express contract applies in terms or intent only to present property, and there is a change of domicil, the law of the actual domicil will govern the rights of the parties as to all future acquisitions.

"3. Where there is no express contract, the law of the matrimonial domicil will govern as to all the rights of the parties to their present property in that place, and as to all personal property every where, upon the principle, that movables have no *situs*, or rather, that they accompany the person every where. As to immovable property the law *rei sitæ* will prevail.

"4. Where there is no change of domicil, the same rule will apply to future acquisitions, as to present property. But where there is a change of domicil, the law of the actual dom-

icil, and not of the matrimonial domicil, will govern as•to all *future* acquisitions of movable property ; and as to immovable property, the law *rei sitæ.*

"And here also, as in cases of express contract, the exception is to be understood, that the law of the place, where the rights are sought to be enforced, do not prohibit such arrangements. For if they do, as every nation has the right to prescribe rules for the government of all persons and property within its own territorial limits, its own laws in a case of conflict ought to prevail."

In support of the foregoing principles the learned author has cited many authorities, and among others *Burge on Colonial and Foreign Law*, (*pages* 618–19, *pt.* 1,) who thus states the principle in regard to the effect of the law of the matrimonial domicil upon the rights of the parties, in the absence of any express contract :

"According to the general doctrine of jurists, the property of husband and wife, whether it be acquired before or after the change of domicil, continues subject to the law of community, notwithstanding they may have removed to another domicil, where that law does not exist. The change of domicil neither divests them of any right which they had acquired under the law of their matrimonial domicil, *nor confers upon them any right* which they could not acquire under that law, &c."

This principle would seem to go even beyond that stated in the text by Judge Story. But this court in the case of *Beard's ex'rs vs. Basye*, (7 *B. Mon.*, 148,) in which the effect of the law of the matrimonial domicil was involved, after alluding to the conclusions of Judge Story, *supra*, and the note of Burge, from which we have quoted, came to the conclusion that the law of the matrimonial domicil should control, in ascertaining the rights between husband and wife with regard to property acquired before such domicil was changed ; and decided in that case, that the rights of the wife acquired in Louisiana, the place of marriage, and where the parties then resided, should be determined by the laws of that State and not by the laws of Kentucky—the latter, in no wise, forbidding the enjoyment of such rights by the wife.

The law of the matrimonial domicil being then the rule which determines the rights of both husband and wife in regard to movables owned by either at the time of marriage, the question as to the extent of the interest of John H. Durbin, deceased, in the slave in dispute, is of easy solution.

It is to be determined by the statute of 1846, (*session acts,* 1845–46, *page* 43,) entitled, "an act further to protect the rights of married women," which was in force when Durbin and wife were married in this State.

The first section of that act declares that the slaves of married women, owned at the time of her marriage, or which may afterwards come to her by descent, devise, gift, or otherwise, shall not be liable for her husband's debts, &c; and the second section provides as follows:

"That the husband and wife may dispose of the slave or slaves of the wife in the same way that they may, by deed, dispose of land, and with like limitations and restrictions according to existing laws; and on the death of the wife such slave or slaves shall descend to her heirs at law as lands descend by the laws of this commonwealth, *subject to a life estate of the husband surviving for his life and no longer.*"

Thus it is plain that the husband at the time of the marriage only acquired a life estate in his wife's slaves; and it is equally clear that his estate therein has been in no wise enlarged by the Revised Statutes—although slaves are, for purposes of distribution, declared by them to be personal property. For in the same chapter which declares slaves to be personal property, for the purpose named, it is expressly said that the husband shall only have a life estate in the wife's slaves. (*1st vol. Stanton's Rev. Stat.,* 423.)

Who then takes the slave in contest? The husband had nothing but a life estate, unless, as alleged in the answer, the wife had the power to devise and did devise her to him—of which there is no proof whatever. The slave is in Kentucky, and is sued for in this State. The appellant, by the laws of this State, is the heir at law and distributee of his daughter, to whom the slave belonged; and, so far as the record shows, there was no obstacle at all to his recovery. It seems to us,

therefore, that the circuit court erred in instructing the jury to find for the defendant.

Inasmuch as the case must be sent back for a new trial, it is proper to mention that the answer of appellee does not distinctly aver that Mrs. Durbin had the right, in Illinois, to dispose of the slave in question by last will. The averment is that "she had full right and authority to dispose, by will or otherwise, of her *personal and separate* estate." If this is intended to show that she could thus dispose of personal estate that was held as separate property, and no other description of personalty, such power would not embrace the slave in question, for there is nothing to show that the slave was "*separate*" property. The distinction between the general estate of a *feme covert*, in which her husband has certain rights resulting from his marital relation, and her *separate* estate, in which no such right exists, is too familiar to need any remark.

For the reasons stated the judgment is *reversed*, and cause remanded for a new trial and further proceedings not inconsistent with this opinion.