## Lee v. Belknap, et al.

(Decided March 9, 1915.)

Appeal from Jefferson Circuit Court (Chancery Branch, First Division).

1. Wills—Construction of.—The first and the controlling guide in the construction of wills is to arrive at the intention of the testator.

2. Wills—Construction of—Separate Estate in Daughter—Exclusion of Husband.—Where the testator provided that "the portions to my daughters shall be held by my executors as their sole and separate estates free from any control of any husbands they may have, but with power in my said daughters to dispose of the same by deed or will, the trustees uniting in the deed," this provision excluded the husbands from control during the life of their wives, but did not exclude them from participation in the personal estate of the wives if they died childless and intestate.

3. Husband and Wife—Separate Estate of Wife—Disposition of.— Where by will or deed a separate estate is given to a woman, to the exclusion of her husband, and with power of disposition, she may make a will and exclude her husband from participation in the estate.

4. Husband and Wife—When Wife Cannot by Will Exclude Her Husband from Participation in Her Estate.—Under the act of 1894, now Secs. 2137, 2148, Kentucky Statutes, a married woman may by will dispose of any estate secured to her separate use by deed or devise to the exclusion of her husband, but she cannot by will exclude her husband from participation in her estate that was not secured to her separate use by deed or devise.

5. Trusts—Trust Estate—When Created.—Where a party by a written instrument transferred and delivered to a trust company certain securities to be held by it, with full power to sell, assign, invest and reinvest, with the provision that the donor might revoke the paper, and with the further provision that if she died intestate, the estate should pass under the statute of descent and distribution in this State, this paper created a trust

for the uses and benefits therein described, although the securities did not contain any endorsement by the donor evidencing the transfer.

6. Wills—Heirs—Meaning of Word.—Where the owner of property delivered it to a trustee, with the direction that upon her death, intestate, it should pass to "those persons who under the statute of descent in Kentucky would be the heirs at law of the first party," the husband came within the meaning of the word "heirs" and was entitled to the share of the estate that husbands receive under the law of Kentucky.

7. Husband and Wife—Marriage—Domicile of Wife.—Where a woman marries in this State a man who resides in another State, with the intention of immediately going to his residence, and she does go there at once upon the marriage, the marriage, in contemplation of law, takes place in the State of the husband's residence, and the matrimonial rights of the parties are impressed with the laws of the State of his residence, to the exclusion of the laws of this State.

8. Husband and Wife—Domicile of Husband is Domicile of Wife.— The domicile of the husband will generally be presumed to be the matrimonial domicile, for on marriage the wife at once loses her own domicile and assumes that of her husband.

9. Husband and Wife—Rights of Foreign Husband in Personal Estate of Wife Found in This State.—Where the wife owned personal estate having a physical situs in this State, but died intestate and childless at the home of her husband in another State, the laws of the State of his residence controlled his right to her property in this State.

10. Husband and Wife—Conflict of Laws—Public Policy.—The common law prevailing in New Jersey under which the husband becomes the owner of the whole of his wife's personal estate upon her death childless and intestate, is not obnoxious to the public policy of this State, and the husband may recover the possession of the personal estate of his wife that has a physical situs in this State, although, under the laws of this State, the husband would get only one-half of his wife's personal estate.

11. Conflict of Laws—Public Policy.—The mere fact that the law of another State differs in degree from the law of this State does not make it so obnoxious to our laws as that our courts will not enforce it.

12. Conflict of Laws—Public Policy.—Our courts will not recognize the existence of foreign laws that are obnoxious to some well founded rule of domestic policy, established to protect the morals, health, safety or welfare of our people.

13. Conflict of Laws—Husband and Wife—Rights of Husband Residing in Foreign State—Construction of Statute.—Under Section 3898, of the Kentucky Statutes, providing that "the personal estate of a non-resident who died intestate, found in this State, shall be distributed according to the laws of the State of which he was an inhabitant," the heirs of a foreign decedent may take

the estate under the common law prevailing in the State of his death, although there may be no statute in that State regulating the matter.

14. Conflict of Laws—Husband and Wife—Construction of Statute.— In distributing the estates of non-residents, under Section 3898, it is not a proper subject of inquiry how the law of the foreign State was established or from what source it originated. It is sufficient that it is the law of that State. Whether the right of distribution in the foreign State is created by statute law, common law, or civil law, it will control the distribution of the estate in this State under this section.

15. Executors and Administrators—Administrator—Rights of Domestic.—It is the policy of our law that the domestic administrator shall hold the personal estate of an inhabitant of another State found in this State until all debts are paid and distribution has been ordered.

HUMPHREY, MIDDLETON & HUMPHREY and JOSEPH DAY LEE for appellant.

BARRET, ALLEN & ATTKISSON, ARTHUR PETER and PERCY N. BOOTH for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming in part and reversing in part.

In April, 1912, Gertrude Belknap, a resident of Louisville, Kentucky, married the appellant, Ronald C. Lee, a resident of the State of New York. Immediately after the marriage the couple took up their residence in New York and became domiciled in that State. Later in the same year they moved to and became domiciled in the State of New Jersey, in which State they were domiciled in January, 1913, when she died, childless and intestate, leaving surviving her two brothers and one sister, residents of Kentucky, and her husband, a resident of New Jersey.

At the time of her death she was the owner of a large personal estate, consisting of stocks, bonds and other securities, the evidences of which were situated in Kentucky. After her death her husband qualified in New Jersey as administrator of her estate, and the United States Trust Company was appointed administrator of her estate in Kentucky. Soon after the death of Mrs. Lee this suit, to which the husband was a party, was brought by her brothers and sister for the purpose of having determined their rights and the rights of the surviving husband in her personal estate, the physical situs of which was in this State.

After being prepared for hearing the case was submitted to the chancellor, who adjudged that the husband was entitled to one-half of the estate and her brothers and sister to the other one-half. It was further adjudged that the United States Trust Company, as administrator of Mrs. Lee, was entitled to take and distribute the personal estate in controversy.

From this judgment the husband appeals, insisting that he was entitled to the whole of her personal estate after the payment of debts. He also questions the right of the Kentucky administrator to administer on the estate.

The personal estate owned by Mrs. Lee at the time of her death has been treated by counsel as consisting of three classes, and in disposing of the case we will follow that classification.

The class we will first consider came to Mrs. Lee under the will of her father, Col. Morris B. Belknap, who died in Louisville in the year 1910, leaving a will which was executed in 1903. The brothers and sister contend that all of the personal property derived by Mrs. Lee under this will passed to them upon the death of Mrs. Lee, upon the ground that the will excluded the husband from any interest therein not only during the life of the wife, but upon her death without children and intestate; while the husband insists that he is entitled to the whole of the personal estate received by his wife under this will.

In determining this issue the chancellor, as stated, gave to the husband one-half and to the brothers and sister one-half of this estate, and the correctness of this judgment depends on the proper construction of the will of Col. Belknap in the light of the law applicable to its construction.

Col. Belknap, in his will, after appointing the Fidelity Trust and Safety Vault Company his executor, appointed three of his friends, naming them, as an advisory committee to co-operate with his executor in the management of his estate. In clause seven he provided:

"All the rest and residue of my estate of every kind, character and description shall be divided by my said executor, with the advice and approval of said advisory committee, as if I had died intestate as to said residue, giving to my heirs the shares to which they would be entitled by law. The portions to my daughters shall be

422 KENTUCKY REPORTS.     [Vol. 163.

held by my executors as their sole and separate estates free from any control of any husbands they may have, but with power in my said daughters to dispose of the same by deed or will, the trustees uniting in the deed. The portions of my sons are to be held by the trustees for them until they arrive at the age of thirty years, respectively, when each shall have his portion conveyed and delivered to him. Before each child arrives at the age of twenty-one years the income from its portion shall be appropriated for its benefit in such manner as the trustees may deem best. After each child reaches the age of twenty-one the income from its portion shall be turned over to the said child by the trustees. If either or both of my sons should die prior to reaching the age of thirty years, leaving a child or children, his portion of my estate shall go to said child or children. If either or both die without leaving children, before reaching thirty years of age, said portion is to go to his heirs."

It will be noticed that Col. Belknap directed that the portions which his sons should receive should be held by the trustees until they arrived at the age of thirty years, giving to them and for their benefit the income from the estate until that time. And further directed that if either of the sons should die before reaching thirty years of age, leaving children, his portion should go to the children, but if no children survived, it should go to the heirs of the son. While in respect to his daughters he provided that their portions should be held by his executors "as their sole and separate estates free from any control of any husbands they may have, but with power in my said daughters to dispose of the same by deed or will, the trustees uniting in the deed."

It is elementary that the first and controlling guide in the construction of wills is to arrive at the intention of the testator, and so the inquiry is, did the testator, by this provision for his daughters, intend to exclude any husbands they might have from any interest in their estates in the event they died childless and intestate, or did he only mean to exclude the husbands from any control of or interest in the estates during the life of his daughters?

We cannot, of course, know from independent sources the precise thought in the mind of Col. Belknap when this carefully worded and evidently well considered paper was written, and so we must look to the will itself

for his meaning; and the scope of this expression might be further limited by saying that we must look alone to that portion of his will in which he provided how the estate received by his daughters should be controlled and disposed of, because the other parts of the will throw little if any light on the intention of the testator in respect to the estate given to his daughters.

It may, however, be said that three ideas stand out prominently in this clause: One is that he did not intend that his sons should come into the full possession of their interest in his estate until they reached the age of thirty; another is that he did not intend that any husbands his daughters might have should have any control or interest in their estates during their lives; and yet another is that he wanted his daughters to have the power to dispose of their estates by will or deed. Whether or not he intended, in the event his daughters died childless and intestate, to exclude their husbands from any interest in their estates after their death is the very question in issue, and this must be determined by the construction the law gives to provisions like the one made.

If we should interpret the provision for his daughters without reference to any statute and according to the ordinary and natural meaning of the words, our conclusion would be that Col. Belknap intended only to exclude the husbands from any control of their estates during the life of his daughters. If his daughters died childless and intestate, without having disposed of the estate by deed or will, as they had the right to do, the purpose of the testator, to secure to them the estate free from the control of any improvident or reckless or extravagant husbands they might have, would be fully accomplished at their death. What he intended to do was to save the estate for them as long as they lived. What became of it after that time was apparently not a matter of great concern. If it had been, it seems to us quite clear that Col. Belknap, in this carefully prepared will, made some years before his death, would have made some direction in respect to the disposition of the estate in the event his daughters died childless and intestate. It was very reasonable and very natural that he should have contemplated in writing this will the marriage of his daughters, and also have contemplated the impossibility of divining the character of men they would marry, and, so to make sure that the provision made for his daughters might

not be squandered by their husbands to their detriment or misfortune, he was careful to exclude the husbands from any control of their estates during the life of his daughters, leaving the estates subject of course to whatever power the executors had over it. But having given to his daughters the full and exclusive control of their portions as long as they lived, he was content to leave it to them to dispose of as they pleased.

Looking at the will itself, this is, briefly stated, our independent notion of all that Col. Belknap intended. We do not, of course, mean to say that Col. Belknap could not have excluded the husbands from participation in the estate after the death of their wives. On the contrary, we have no doubt that he could have done so by appropriate words clearly manifesting such an intention. Haight v. Hall, 14 Wis., 154, 3 L. R. A., 857; Pool v. Blakie, 53 Ill., 495.

But here the testator used the substance of words that prior to 1894 had been consistently construed by this court not to exclude the husband after the death of his wife. Payne v. Payne, 11 B. Mon., 138; Brown v. Alden, 14 B. Mon., 114; Wood v. Reamer, 118 Ky., 841; Cox v. Coleman, 13 B. Mon., 451; Hughes v. Saffell, 134 Ky., 175.

Coming now to consider the state of the law when the will was written and probated, and at all times since, we find that in 1894 the Legislature of the State enacted a statute that made radical and sweeping changes in the law as it had existed since the beginning of the State respecting property rights of married women. This legislation, which is now contained in Sections 2127 and 2128 of the Kentucky Statutes, provides, in part, that ''Marriage shall give to the husband, during the life of the wife, no estate or interest in the wife's property, real or personal, owned at the time or acquired after the marriage. During the existence of the marriage relation the wife shall hold and own all her estate to her separate and exclusive use, and free from the debts, liabilities or control of her husband. * * * A married woman may take, acquire and hold property, real and personal, by gift, devise or descent, or by purchase, and she may, in her own name, as if she were unmarried, sell and dispose of her personal property. She may make contracts and sue and be sued, as a single woman, except that she may not make any executory contract to sell or

convey or mortgage her real estate unless her husband join in such contract."

Previous to this enactment the property rights of married women were controlled, generally speaking, by the principles of the common law which gave to the husband, upon his marriage, the entire personal estate of his wife, unless a separate estate had been created in her property that excluded the right of the husband to take possession of and control it. While the law was in this condition this court had occasion in more than one case to interpret the meaning and effect of words in wills similar to those used by Col. Belknap in making provision for his daughters, and it was uniformly held, as stated in Wood v. Reamer, 118 Ky., 841, that where a separate estate was created for a married woman, unless there were words excluding the marital rights of the husband, after her death, the separate estate terminated and the husband came into the full possession of his common law right to take the whole of the personal estate to the exclusion of the heirs of the wife, unless by the terms of the instrument creating the separate estate he was expressly excluded from participating at her death. So that, leaving out of view for the moment the act of 1894, there could not be any question raised as to the right of the husband to participate in the estate of his wife, because there are no words in the will expressing an intention to exclude the husband after the death of his wife.

Counsel for the Belknap heirs do not question the correctness of this statement of the law as it existed prior to 1894, but they insist that the rule of construction in force under the old law has been changed by the act of 1894. They further insist that as the act of 1894, which had been in force about ten years when the will was written, excluded the husband from all control over the estate of the wife during coverture, Col. Belknap must have intended to do more than this act provides for, or else there would have been no reason for inserting in his will a provision excluding the husband during coverture. Proceeding upon this theory the argument is made that Col. Belknap had it in mind not only to exclude the husbands during coverture, but to exclude them from any participation in the estate of their wives after death, unless the wives by deed or will gave them, as they might do, their estate.

Of course this argument is all mere conjecture on the part of counsel. It has no basis on which to rest except supposition. Col. Belknap may or may not have had in mind the statute referred to. He may or may not have known of this statute. He may or may not have known of the construction that the law would place on his words, but it is very clear that he knew what he wanted to do and he found very apt words to give expression to his ideas. But, in deference to the insistence of counsel for the Belknap heirs that the construction of this provision for his daughters is controlled very largely by the act of 1894, we will briefly consider the effect of this act as we understand it upon provisions in wills similar to the one here in question.

The act of 1894 was intended to enlarge and not to abridge the rights of married women. It was intended to confer upon them privileges and powers they did not previously enjoy. The chief purpose of it was to give to married women the right to own and hold and control their property free from the dominion of their husbands; but it was not intended to abolish the law of separate estates as previously recognized and enforced in this State or to prevent the creation of estates by will or deed enlarging the rights of married women in respect to the control and disposition of their property. In other words, the act of 1894 was only intended to affect the rights of married women in property which they owned uncontrolled by the limitation of a will or deed.

Previous to the act of 1894 there was in force, and is yet in force, Section 4827, providing that "a married woman may, by will, dispose of any estate secured to her separate use by deed or devise, or in the exercise of a written power to make a will;" and it was well settled law before the act of 1894 that a married woman had the same control over her separate estate as if she were a single woman. Johnston v. Jones, 12 B. Mon., 326; Lillard, v. Turner, 16 B. Mon., 374; Hackett v. Metcalfe, 6 Bush, 352; Ford v. Ford, 2 Duv., 418. And this law has not been changed by the act of 1894.

The act of 1894, in Section 2147 of the Kentucky Statutes, also provides that "a married woman, if she be of sound mind and twenty-one years of age, may dispose of her estate, by her last will and testament, subject to the provisions of this act." This section, as will be observed, gives full power to a married woman

to make a will without reference to whether the estate disposed of was secured, to her separate use by deed or devise, or the will was made in the exercise of a written power, except that she cannot make a will to the exclusion of her husband.

It was so ruled in Smoot v. Heiser, 113 Ky., 81. In that case the wife, by her will, made after the act of 1894, devised her property to her brothers to the exclusion of her husband. Her brothers contended that she had a right to do this by virtue of a judgment of the Grayson Circuit Court empowering her to act as a *feme sole* under the statute then in force; and, further, that she had this right under the act of 1894. But the court, in a very brief opinion, said that neither under the judgment nor the act of 1894 did the wife have the power to exclude her husband from the estate given to husbands by the act of 1894. In Cunningham v. Cunningham, 140 Ky., 193, the court merely adopted the views of the Smoot case, holding that a wife could not, under a judgment empowering her to act as a *feme sole,* or the act of 1894, dispose of her property by will to the exclusion of her husband.

These cases are relied on by counsel for the Belknap heirs, but they do not conflict in the slightest with what we have said as to the power of a wife to exclude her husband when that power is conferred by will or deed. In these cases the rights of a married woman under a deed or will were not considered at all.

Our opinion, therefore, is that since the act of 1894 a married woman may by will dispose of any estate secured to her separate use by deed or devise to the exclusion of her husband. But she cannot by will exclude her husband from participation in her estate that was not secured to her separate use by deed or devise. In other words, if the wife receives or acquires property in any way or from any source, unhampered by the provisions of a deed, will, or other instrument, her rights in such property are controlled and determined by the act of 1894; but if the wife receives or acquires property under a will or deed that confers upon her greater privileges than the act of 1894, then these privileges may be exercised to the same extent they could have been exercised before the act of 1894.

Accordingly, this will conferred upon the daughters of Col. Belknap greater powers than they could have ex-

ercised under the act of 1894 if the estate had been given to them in general terms without any restrictions or powers, and we think the provisions for the daughters should be interpreted without reference to the act of 1894 and according to the rules of construction that prevailed before the enactment of this statute. Under this view, the husband, if the wife had died a resident of Kentucky, would have taken, under the statute, one-half of her personal estate. What share of it he takes under the law of New Jersey, where they were domiciled at the time of her death, will be considered later.

Another class of property about which the same controversy arises was created in this way: In June, 1911, and before her marriage, Gertrude Belknap entered into the following contract with the Fidelity Trust Company:

"This agreement, made and entered into this 26th day of June, 1911, by and between Gertrude Belknap, party of the first part, and Fidelity Trust Company, of Louisville, Kentucky, party of the second part: Witnesseth: That for and in consideration of the sum of one dollar cash in hand paid and the agreements hereinafter set forth, the party of the first part has this day assigned, transferred and delivered to said party of the second part, the securities and personal property belonging to said party of the first part, which are fully described in the schedule hereto annexed as part hereof, marked, 'List of securities, Gertrude Belknap,' and bearing the signature of the parties hereto for further identification. It is agreed between the parties hereto that:

"First: The Fidelity Trust Company shall hold, manage and control the securities and estate as above set forth, as agent for said party of the first part, with full power in said Fidelity Trust Company to sell, assign, transfer and deliver any or all of said securities and other personal property so held by it, and to invest and re-invest, in its discretion, the proceeds of any such sale or sales.

"Second: The net income arising from said estate shall be paid by said party of the second part to the party of the first part in monthly or quarterly installments as may be agreed upon between the parties to this agreement.

"Third: This agreement may be terminated by mutual consent of the parties hereto at any time or upon sixty days' written notice by the party of the first part

to said party of the second part of her desire that the agreement shall be terminated and the securities and estate delivered back to said party of the first part, or as she may direct.

"Fourth: In the event that this agreement is not terminated by the parties, or either of them as herein provided, upon the death of the party of the first part the estate so held in her behalf by said second party shall pass as may be directed by the last will and testament of the party of the first part, or by writing in the nature of a last will and testament, and in the absence of such will, the property shall pass absolutely to those persons who, under the present Statutes of Descent in Kentucky, would be the heirs-at-law of the party of the first part.

"Fifth: The party of the second part agrees to undertake the management of the estate as herein provided and to accept in full compensation for its services an amount equal to four per cent. of the gross income received by it from such estate.

"The charges for services as herein provided include the care and management of the estate embraced in this agreement, safeguarding of all securities, investment and re-investment of funds, keeping of all accounts, payment of charges and expenses, rendition of statements periodically or as may be desired by the party of the first part, and the performance of all duties usually entrusted to an agent under an agreement of the nature of this instrument.

"In testimony whereof, the parties of the first and second parts have hereunto subscribed their names in duplicate this day and year first written above. (Sgd.) Gertrude Belknap, Fidelity Trust Company. (Sgd.) By G. S. Adams, Vice-President. Dated July 19, 1911."

It will be observed that in this writing Gertrude Belknap transferred and delivered to the Trust Company certain securities and personal property with the provision that the Trust Company was to hold, manage and control the estate transferred, with full power to sell and transfer, invest and re-invest. It further provided that the agreement might be terminated by mutual consent upon notice, and if terminated the estate was to be delivered back to Miss Belknap. But if the agreement was not terminated, or she did not dispose of it by will, the property was to descend to those persons who, under the laws of Kentucky, would be her heirs-at-law.

For the Belknap heirs it is contended: (1) That by this writing Gertrude Belknap transferred the property described to the Trust Company to be held by it as trustee; and (2) that upon her ᶜeath without having terminated the agreement or disposed of the estate by will, it passed to them, to the exclusion of her husband, who, as they say, was not, within the meaning of the writing, an heir-at-law of Gertrude Belknap.

On the other hand, in behalf of the husband, the argument is made that this writing merely created an agency and not a trust, and that the agency was revoked by the death of the principal, Gertrude Belknap, leaving the property in the hands of the Trust Company as a part of her general estate, and it should be distributed as such; or, if this view is not accepted, then her husband, being an heir, was entitled, under the laws of Kentucky, to one-half of the estate.

The further question is made by counsel for the husband that this writing in no event affected any securities or estate the legal title to which was not actually delivered to the Trust Company by transfer and assignment, and, therefore, so much of the property as was delivered to the Trust Company without such transfer or assignment as would pass the legal title to it was not affected by the trust, if the writing should be held to be a trust.

Although the writing declared that the property transferred to the Trust Company was described in the schedule annexed to the writing, it appears that no such schedule was ever made, although at the time, or subsequent to the writing, Gertrude Belknap did deliver to the Trust Company the securities here in question.

We think that by this paper the donor intended to and did create a revocable trust in the Fidelity Trust Company to the uses and benefits described in the paper. She surrendered to it the full control of the property delivered, and directed what disposition should be made of it. Nor do we attach controlling importance to the fact that the transfer of the legal title to some of the securities delivered to the Trust Company was not effected by endorsements evidencing the transfer or embraced in the schedule the donor intended to but did not make. The delivery was complete and its purpose plain. The mere endorsement of the transfer on each of the securities or in a paper signed by the donor, could not have accomplished more certainly her intention than did

the acts that she did. Roche v. George, 93 Ky., 609; Williamson v. Yager, 91 Ky., 282; Marshall v. Marshall, 156 Ky., 20; Lyle v. Burk, 40 Mich., 499.

There is another view of this matter sufficient, as we think, to authorize us in holding that the descent and distribution of these securities must be controlled by the laws of this State, whether this paper should be treated as creating a trust or merely an agency. It is conceded that these securities came properly into the possession of the Trust Company and that it was holding and exercising over them when the donor died the control provided for in the writing. So that when Mrs. Lee died the property was in the actual possession of the trustee for a specific purpose and had an actual situs at its place of business in Louisville, Kentucky. It was left in the hands of the Trust Company under an express agreement that it was to remain in this State in its possession and pass at the donor's death as provided in the laws of Kentucky, in the absence of a testamentary disposition of it by her or a termination of the agreement. The title to this estate did not accompany Mrs. Lee to New York, nor did it follow her to New Jersey. It remained, as she intended it should remain, in this State, to descend, and it did descend, under the laws of this State, unaffected by the laws of either New York or New Jersey.

The only remaining question is, was her husband an heir within the meaning of the clause in the agreement that "the property shall pass absolutely to those persons who, under the present Statutes of Descent in Kentucky, would be the heirs-at-law of the party of the first part." There is no description of the word "heirs" and no intimation of a purpose to limit the meaning of this word or to exclude any person who might inherit in case of intestacy, and, therefore, we think, that all persons who at the death of the donor intestate would come into a part of her estate under the laws of Kentucky should be considered heirs and entitled to share in this estate. Clay v. Clay, 2 Duv., 295; Words and Phrases, Vol 4, page 3253. Under the law of this State her husband, who should be treated as an heir under this agreement, was entitled, upon her death intestate, to one-half of her surplus, personal estate, and this is what the chancellor correctly adjudged.

The other class of property in question consists of personal estate owned by Mrs. Lee when she married

and at the time of her death. This estate may be called her general estate and was held by her in fee, free from any restrictions or limitations. This estate, at her death, came into the custody of the United States Trust Company as administrator of her estate in Kentucky, and is now held by it as such administrator.

Respecting this estate, the husband claims that its descent is controlled by the law of New York, in which State he and his wife resided after their marriage, and until their removal to New Jersey; or, if not, it is controlled by the law of New Jersey, in which State his wife was domiciled at the time of her death.

If the descent of this estate is controlled by the law of New Jersey, then, under that law, the husband is entitled to the whole of the surplus personal estate, after the payment of debts.

On the other side, the Belknap heirs insist that the husband is not entitled to any part of this estate, either under the law of New York or New Jersey, as the laws of these States under which he claims the estate are opposed to the public policy of this State, and, therefore, the courts of this State will not enforce rights arising under them. It is further contended that as the husband, under the New Jersey law, does not take the personal estate of his wife, who dies childless and intestate, by virtue of or under any statute law of that State, but solely under the common law and by virtue of the marriage relation, there is what is called a legal obstacle in the way of his taking or obtaining the estate here in question. So they claim the whole of this estate.

As the same question is made by the Belknap heirs with respect to the estate received by Mrs. Lee under the will of Col. Belknap, we will treat the estate received by her under the will and the estate in the hands of the United States Trust Company as administrator as being in one and the same class, controlled by the same principles, and so considering it, endeavor to ascertain the respective rights of the parties, thus leaving entirely out of view the estate surrendered to the Fidelity Trust Company, which has heretofore been disposed of.

We have been furnished by counsel for both parties with elaborate briefs on this issue, and a great many authorities have been cited, and many questions discussed, all of which have been carefully considered by the court.

But in this opinion we will confine ourselves to such questions and authorities as seem to be pertinent and controlling, leaving the others unnoticed.

In determining this question it is important to keep well in mind the fact that when Gertrude Belknap married, her husband was a resident of the State of New York, and that the marriage was entered into in contemplation of her immediate removal to his home in that State, to which place she did in fact at once remove and take up her residence.

The effect of this intention and immediate removal in accordance therewith upon the personal estate of Mrs. Lee was that in contemplation of law the marriage took place in New York, and the matrimonial rights, powers and disabilities of the parties were, at the very moment of the marriage, impressed with the laws of New York. The laws of that State at once became operative and controlled their property rights to the exclusion of the laws of Kentucky.

In 5 Ruling Case Law, page 1006, it is said: "With respect to personal property, the general rule of international law is that the respective rights of husband and wife and their creditors are determined by the law of the matrimonial domicile, irrespective of the place where the property is acquired, found, located or seized. * * * Personal property owned by either of the parties at the time of the marriage is governed by the matrimonial domicile they first assume, and where there is no change of domicile, the same rule will apply to future acquisitions as to present property. The question as to what place is to be regarded as the matrimonial domicile is, in its last analysis, one of the intention of the parties at the time of the marriage as to where they shall establish their residence, assuming that such intention is carried out within a reasonable time. In the absence of any indication of a contrary intention, the domicile of the husband will generally be presumed to be the matrimonial domicile, for on marriage the wife at once loses her own domicile and assumes that of her husband. Story on Conflict of Laws, page 271; Bishop on Married Women, Section 578; Townes v. Durbin, 3 Met., 352; and extended notes in 85 Am. St. Rep., page 553, and 57 L. R. A., 353."

We have then this state of case: The personal estate of Mrs. Lee had a situs in New York when the mar-

riage took place, and when the parties removed from New
York and took up their domicile in New Jersey, all the
personal estate of the wife accompanied the parties to
that State and had a situs there when Mrs. Lee died, its
descent and distribution being controlled by the laws of
New Jersey.

Without extending this opinion with a full recital of
the laws of New York and New Jersey, it is agreed, as
we understand it, that under the laws of New York, as
well as New Jersey, the husband, during the life of his
wife, does not have any control over her personal estate,
but, upon the death of the wife, intestate and without
issue, the surviving husband becomes entitled to all of
his wife's personal estate, not by virtue of or under any
statute of descent or distribution, but under the common
law prevailing in those States. So that if Mrs. Lee had
removed to New Jersey all the evidences of her personal
estate that were in this State, there could be no question
raised about her husband's ownership of it under the
laws of New Jersey. This, however, was not done, and
so it became necessary that the husband should bring a
suit in this State to recover the physical possession of
the personal estate of his wife that remained in this
State, to which he asserted ownership under the laws of
New Jersey. When he came here for this purpose he
was met, as stated, with the objection that the courts of
this State would not enforce rights arising under the
New Jersey law because that law was in conflict with the
public policy of this State, and the further objection that
there was no law of New Jersey entitling the husband to
the estate sought here to be recovered.

The chancellor adopted this view of the law and ac-
cordingly refused to give to the husband the entire es-
tate to which he was entitled under the New Jersey law,
holding that it should pass under the laws of Kentucky,
which gave to the husband one-half of the surplus per-
sonal estate and to the Belknap heirs the other one-half.

Let us now see if the New Jersey law is so offensive
to the public policy of this State that our courts will re-
fuse to recognize or enforce it.

Section 3878 of the Kentucky Statutes provides that:
"By giving bond, with surety, resident of the county in
which the action is brought, non-resident executors or
administrators of persons, who, at the time of their death,
were non-residents of this Commonwealth, may prose-

cute actions for the recovery of debts due to such decedents.''

And in Section 3879 it is provided, in part, that: ''In such actions the plaintiff's letters, testamentary or of administration, granted by a competent tribunal, properly authenticated, must be filed; and no judgment shall be rendered until the plaintiff executes bond, with good surety, resident of the county, to the Commonwealth, conditioned to pay any debt due by his decedent to any resident of this State to the extent assets shall come to his hands.''

Section 3898 reads: ''When administration shall be taken in this Commonwealth on the estate of any person who was an inhabitant of any other State, his personal estate found here, after payment of his debts to citizens of this Commonwealth, shall be disposed of according to his last will, if he shall have executed any, according to the law of his domicile. If there be no such will, his personal estate shall be distributed and disposed of according to the laws of the State of which he was an inhabitant.''

Section 3899 reads: Upon the settlement of such an estate, after the payment of the debts in this Commonwealth, the residue of the personal estate, if any, may be distributed and disposed of in the manner stated in the next preceding section.''

It will, therefore, be seen that the laws of this State recognize the right of foreign executors and administrators to maintain actions in this State, and also provide that the personal estate of a deceased non-resident found in this State shall, after the payment of debts, be disposed of according to his last will, if any, and if no will, shall be distributed and disposed of according to the laws of the State of which he was an inhabitant at the time of his death. The laws of our State, therefore, recognize to the fullest extent, not only the right of foreign executors or administrators to come into our courts, and, upon the execution of the necessary bond, institute such actions as may be necessary to recover the estate due to the decedent whom they represent, but they also declare that the personal estate of the decedent found in this State shall be distributed and disposed of according to the laws of the State of which he died a resident.

It is under and by virtue of these statutes that Lee, as administrator in New Jersey, comes into this State

and seeks to recover the personal estate of his wife found in this State at her death, and to have the same distributed according to the laws of New Jersey, where she was domiciled at the time of her death.

Of course, if the laws of the State of New Jersey in respect to the rights of the husband in the personal estate of his wife, who died childless and intestate, were substantially similar to the laws of this State in like cases, no objection whatever could have been raised to the right of Lee, as administrator, to have, after the pay-- ment of debts due resident creditors, the estate of his wife according to the laws of New Jersey. But because it happens that the laws of New Jersey in respect to the rights of a surviving husband in the personal estate of his wife, who died childless and intestate, are not substantially similar to the laws of this State, it is said they are so obnoxious to the laws of this State as that the husband should be denied the right to have distribution according to the laws of the State in which his wife died a resident, and so must take under the laws of this State.

The difference in the laws of the two States that has been seized hold of to accomplish this supposed offensive conflict with our public policy consists merely in the fact that, under the law of New Jersey, or, to be more accurate, under the common law in force in that State, the surviving husband is entitled to the whole of the surplus personal estate of his wife, if she dies intestate and childless, while under the laws of this State, under like circumstances, he would be entitled to only one-half of her estate.

This objection does not seem to us to have any substantial ground upon which to stand. Surely the mere fact that the law of another State differs only in degree from the law of this State cannot make it so obnoxious to our laws that our courts will not enforce it. If this doctrine should obtain, there would be little of what is called comity between the States, and our courts would, in every instance in which it was sought to enforce rights or obligations arising under the laws of a sister State, find themselves unable to grant any relief if the law of the sister State differed from the like law in this State.

Much has been written on the subject of conflict of laws, and the books are full of cases attempting to define public policy, but it seems entirely unnecessary that we should go into any extended discussion of this sub-

ject in disposing of the question now before us. It is entirely probable that the laws in each of the forty-eight States in the Union differ as to the descent and distribution of estates, and it would be extending the doctrine of public policy to unheard of and impossible limits to say that the personal estate of a deceased inhabitant of another State that was found in this State could not be distributed without prejudice to the rights of domestic creditors according to the law of the domicile if that law happened to be different from our law. Noonan v. Kemp, 34 Md., 73, 6 Am. Rep., 307.

A rule like this carried to its logical conclusion would virtually abolish in this State the doctrine of comity that has so long prevailed. It would bring about a condition of affairs that would create intolerable uncertainty and confusion in the adjustment of rights arising in other States that it so often becomes the duty of our courts to enforce; and this, too, at a time when the recognition here of the laws of other States that are not obnoxious to some well founded rule of domestic policy established to protect the morals, health, safety and welfare of our people, is indispensable in the interchange of the private and business affairs that are constantly being carried on between the people of this and other States. The law of a sister State might, of course, be so obnoxious to the public policy of this State as that our courts would not enforce it, but the fact that makes it so must be found in some other quality than mere dissimilarity to our laws such as exist in the present instance. Gibson v. Sublett, 82 Ky., 596; Hussey v. Sargent, 116 Ky., 53.

It is further asserted that as a New Jersey husband takes the estate of his wife, who dies intestate and childless, by virtue of the common law prevailing in that State, and not under any statute law of the State, therefore, so much of Section 3898 as provides that "his personal estate shall be distributed and disposed of according to the laws of the State of which he was an inhabitant," has no application, because, as it is said, there is no law in New Jersey such as our statute refers to.

This was the view adopted by the Supreme Court of Missouri in Locke v. McPherson, 163 Mo., 493, 85 Am. St Rep., 546, a case presenting directly the question now under consideration. In that case Mary McVean, who was a resident of St. Louis, and who owned considera-

ble real and personal property in the State of Missouri, married McPherson, who was then and had been for many years a citizen of New York. They married in St. Louis, but it was her intention to go with her husband to his home in New York, and that was to be their residence. A very short time after her marriage, and before she had time to remove to New York, she was taken ill and died in St. Louis, intestate and, of course, childless. Administration on her estate was granted in Missouri, and, after the payment of her debts, there was a considerable amount of personal property for distribution. The husband, having been appointed administrator in New York, filed a suit in the St. Louis court as administrator and surviving husband, for the purpose of recovering the property in the possession of the Missouri administrator. The lower court decided that the brothers of Mrs. McPherson, and not her husband, were entitled to her estate, and he appealed.

The question was raised as to whether Mrs. McPherson died a resident of Missouri or New York, but the court seemed to be of the opinion that the result would be the same if it were conceded that she died a resident of New York, and apparently disposed of the case on the theory that she died a resident of that State. The Missouri Statute, which is very much like ours, provided that: "When administration shall be taken in this State on the estate of any person who, at the time of his decease, was an inhabitant of any other State or country * * * his personal estate shall be distributed and disposed of according to the laws of the State or country of which he was an inhabitant." The court then said under the law of New York the surviving husband, if his wife die intestate and childless, takes her estate, not as distributee or under any statute, but by the title vested in him at his marriage through the common law to all of his wife's personal property, and so to adjudge the husband entitled to the estate, they must hold that by virtue of his marriage in Missouri he acquired title to all of her personal property, subject only to her right to the use of it during her life, saying further:

"Our married woman's statute makes no exception in favor of a non-resident husband. If the appellant in this case, by his marriage, acquired such a title to his wife's personal property, every husband marrying in this State a woman with personal property acquires a

like right. This court has never yet put such a construction on our married woman's act. When a married woman dies intestate, leaving personal property that she had held in her lifetime as her statutory separate estate, it passes to her administrator and is distributed on final settlement according to the same statutes that direct the course of distribution of any other intestate's estate. * * * But in this case, if the intestate was an inhabitant of New York, we cannot distribute her estate according to the laws of that State, because, under the laws of that State, the statute of distributions does not apply to the estate of a married woman dying without descendants, for the reason that, under the law of that State, there was no estate to distribute; it belonged to the surviving husband by his common law marital rights. * * * If we are to recognize that a citizen of New York marrying in this State acquires, by virtue of his marriage, the interest in his wife's estate owned here that he would have acquired if he had married in his own State a wife owning like property there, we would also have to recognize the absolute rights of a husband coming from a State or country where the common law on the subject was unabridged. We do not recognize any such qualification of the rights of married women under our statute. Since, therefore, the husband did not, by virtue of his marriage here, acquire such title to his wife's personal property as he would have acquired to such property in New York if they had been married there, and since there is no statute of distribution in New York by which he can take the estate, he has no title to it.''

The chancellor, in determining this case, adopted the views of this opinion, but we are not disposed to follow the reasoning or accept the conclusion reached by the Missouri court. It seems to us entirely too narrow and technical. An interesting comment on this case will be found in 29 L. R. A. (N. S.), 780.

When the statute of our State declares that the personal estate of a non-resident shall be distributed according to the laws of the State of which he was an inhabitant at the time of his death, it means the law in force in that State, whether it be common law or statute law, or by whatever name it may be called. In distributing estates of non-residents under this statute it is not, we think, a proper subject of inquiry how the law of

the foreign State was established or from what source it originated. We are concerned only in knowing that it is the law of distribution prevailing in that State, unless it be that the foreign law is so offensive to the public policy of this State as to warrant our courts in refusing to recognize or enforce it.

In some of the States the common law has been left untouched by statute; in others—at least one—the civil law prevails; and in yet others, like our own, the statute law controls. But, whether the right of distribution in the foreign State is created by common law, statute law, or civil law, it will control the distribution in this State under Section 3898 of the Kentucky Statutes.

The remaining question is, does Lee take the personal estate directly in his own right as husband, or as administrator in New Jersey, or must he take it through the administrator of his deceased wife in Kentucky? This question affects only the rights of the United States Trust Company, the Kentucky administrator, and Lee. Upon this point we think he takes the estate through the local administrator and that this administrator has the right to hold it for the payment of debts and until distribution has been ordered.

It is the policy of our laws, as expressed in Section 3898 of the Kentucky Statutes, that the domestic administrator shall hold the personal estate of an inhabitant of any other State found in this State until all debts are paid and distribution has been ordered. This is for the protection of creditors and others in this State who may be interested in the estate of the non-resident and to better secure them in their right to the portion of the estate to which they are found entitled.

Wherefore, for the reasons stated, so much of the judgment of the lower court as gave to the husband one-half of the estate in the hands of the Fidelity Trust Company and recognized the right of the United States Trust Company as administrator is affirmed; and so much as gave him only one-half of the remainder of the estate is reversed, with directions to enter a judgment giving him the whole of it.